Rex T. KEARNEY, Jr., Plaintiff–Appellant,

v.

STANDARD INSURANCE COMPANY, Defendant–Appellee.

Rex T. KEARNEY, Jr., Plaintiff–Appellant,

v.

STANDARD INSURANCE COMPANY, Defendant–Appellee.

Nos. 96–16539, 96–16701.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1997.

Decided April 21, 1998.

As Amended May 19 and June 3, 1998.

Marjorie E. Manning, T.D. Bolling, Jr., Bolling Walter & Gawthrop, Sacramento, California, for plaintiff-appellant.

Shawn Hanson, Michael A. Conley, Pillsbury Madison & Sutro, San Francisco, California, for defendant-appellee.

Before: SNEED, FLETCHER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Plaintiff-appellant Rex T. Kearney, Jr. is an attorney who was a civil trial partner, and managing partner, at the law firm of Ingoglia, Marskey & Kearney. In 1992, following open heart surgery, he began receiving disability benefits under a Long Term Disability Plan issued by Defendant–Appellee Standard Insurance Company. Within two years of approving such benefits, however, Standard terminated them. Kearney eventually brought suit under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B) (1994), but the district court granted summary judgment in favor of Standard primarily because in its view "the fact that [Kearney] should, like most of us, avoid severe emotional stress or very hard work does not warrant the conclusion that he cannot practice as a trial attorney." We find both the district court's "diagnosis" and its conclusion very much open to question. Therefore, we reverse and remand.

## BACKGROUND

Because we must review this case de novo,[1] we set forth the facts in some detail.

Rex Kearney regularly worked long hours trying civil lawsuits until he encountered health problems. As a trial attorney, a large part of Kearney's success was due to his ability to work very hard while retaining excellent cognitive and verbal skills, often under severe pressure. Indeed, one doctor described him as having a classic "Type A" personality—a frequently obsessive, compulsive worker. On November 3, 1992, however, Kearney—who had already suffered a heart attack in 1981 at the age of 43 and undergone angioplasty of the diagonal artery in 1988—experienced chest pain and nearly collapsed in court during a trial. Six days later, Kearney underwent five-vessel coronary bypass surgery, mitral valve repair, and a closure of a patent pinhole in his heart muscle.

---

1. *See infra* Part I.

About a month after the surgery, Dr. Stephen Morrison, a Board Certified cardiologist, examined Kearney and noted that he was experiencing musculoskeletal symptoms which should resolve in the next several weeks. Dr. Morrison added, however:

> I am also concerned about his memory and I am [sic] told him that I am impressed that this occurs frequently after bypass surgery, and I am hopeful that this will also significantly improve as it is a very large part of his occupation to have a very adequate and perhaps excellent memory as he is a practicing attorney.

Kearney forwarded this letter and a request for disability benefits to his firm's insurer, Standard Insurance Company ("Standard").

Part 6 of Standard's insurance policy issued to Kearney, the "Long Term Disability Insuring Clause," reads:

> Subject to all the terms of the GROUP POLICY, STANDARD will pay the LTD benefit described in Part 8 upon receipt of satisfactory written proof that you have become DISABLED while insured under the GROUP POLICY.

The definition of "disability" is set forth in Part 5 of the policy and reads:

**A. DEFINITION OF DISABILITY FOR ATTORNEYS.**

You are only required to be DISABLED from your *specialty* in the practice of law.

> You are DISABLED from your *own specialty* in the practice of law if, as a result of SICKNESS, ACCIDENTAL BODILY INJURY or PREGNANCY, you are EITHER:
>
> 1. Unable to perform with reasonable continuity the material duties of your *specialty* in the practice of law; OR
>
> 2. Unable to earn more than 80% of your INDEX PREDISABILITY EARNINGS while working in your *specialty* in the practice of law.
>
> Under this definition of DISABILITY, you will be considered DISABLED while working in another occupation if you are DISABLED from your *specialty* in the practice of law.

On December 29, 1992, Standard approved Kearney's claim for disability benefits.

Over the next several months, Dr. Morrison continued to see Kearney. At one point, Dr. Morrison rated Kearney as a "Class I" cardiac patient—a patient in whom ordinary activity should not cause undue fatigue, pain, or palpitation. At the same time, however, Dr. Morrison noted Kearney experienced premature ventricular contractions during his examination. In a later report, on May 11, 1993, Dr. Morrison reclassified Kearney as a "Class II" patient and wrote that he believed that he would be unable to return to his usual occupation for 6–12 months and, then, up to only 75% of his pre-surgery workload.

During the same time period, several other doctors examined Kearney and reached similar results. The first was Kearney's treating physician for 20 years, Dr. Lehman. Initially, Dr. Lehman noted that Kearney "feels he's lost 20% of his intelligence off the top." In a letter submitted to Standard on February 26, 1993, Dr. Lehman summarized the results of the cardiology examination he performed on Kearney:

> Unfortunately, the patient is manifesting evidences of cognitive impairment, which has been well reported after coronary artery bypass surgery, particularly, as in Mr. Kearney's situation, when the patient does truly have open heart surgery.... At the present time, I would have to consider him completely or near completely disabled, though most of these patients recover function within 6 months, and I am hopeful that we still might see some improvement in the relatively near future.

Dr. Lehman diagnosed Kearney with status post-coronary artery bypass and mitral valve angioplasty with "persistent fatigue and diminished intellectual capacity."

Kearney's psychiatrist, Dr. Kaufman, also submitted medical data to Standard. Dr. Kaufman reported that Kearney had a loss of memory and knowledge. Kearney, for example, failed to recollect a client with whom he had met recently. Dr. Kaufman stated that Kearney suffered from "more than average" loss of memory for this age and concluded that he would not be able to do trial work.

The danger for Kearney, according to Dr. Kaufman, was that "[Kearney] doesn't know what he doesn't know."

The final doctor to examine Kearney during this period was Dr. Peter Heublein, a medical neurologist. Dr. Heublein noted in his report, which was forwarded to Standard, that Kearney stated that "he cannot return to work as a litigating attorney under the present circumstances." Dr. Heublein wrote that it was impossible to tell whether Kearney was suffering from organic brain syndrome or anxiety and depression-induced memory loss. Furthermore, Dr. Heublein stated that, because Kearney's MRI scan was "unremarkable," psychometric testing would be necessary to document Kearney's organic memory and cognitive disturbances as well as potential psychological components.

As concrete evidence of his disability, Kearney informed Standard that during two days of light work—a settlement conference and two depositions—he became "stressed out," had "PVC" palpitations, and was hospitalized briefly. Subsequent stress EKG's while Kearney was on a treadmill did not reproduce those symptoms, indicating that they were most likely stress-induced. Once Kearney was out of the hospital and away from work, he returned to rehabilitation without further problems. In November 1993, due to his debilitated condition, Kearney closed his law office. Kearney also explained to an investigator that he had to cease teaching continuing legal education courses because he could no longer recall the civil code in a manner sufficient to permit him to answer questions. He also stated that he was able, with adequate rest, to play a few sets of doubles tennis on the weekends.

Reports submitted to Standard through the rest of 1993 continued to confirm Kearney's cognitive and stamina impairments. Dr. Lehman sent Standard a statement concluding that Kearney's "intellectual impairment precluded legal work." Dr. Lehman was unable to determine when Kearney could return to work, and added, "It's been so long, I doubt he'll recover, unfortunately." In addition, in December, 1993, Dr. Morrison informed Standard that Kearney's condition was unchanged and that he continued to be restricted by his poor memory. Dr. Morrison said that he did not know when Kearney could return to work, but recommended a follow-up appointment in six months.

In April, 1994, Standard asked another doctor of its choosing, Dr. Randall Smith, to conduct an "independent" medical examination of Kearney. Dr. Smith, a neuropsychologist, reported that he found in Kearney no evidence of cognitive deficiencies based on formal testing; that mental status exams resulted in exceptional performance; and that there was no evidence of aphasia, paraphysis, or word-finding pauses. Dr. Smith reported that Kearney's cognitive "Shipley test" indicated average abstract reasoning skills and above average verbal skills. He characterized Kearney as possessing "superior general memory functioning and unimpaired verbal and visual memory functions" in light of these "average" scores, but noted that Kearney had done "somewhat more poorly on a measure of active attention and concentration." Finally, Dr. Smith reported that Kearney told him he had a hobby of rebuilding and driving race cars in excess of 100 miles per hour.

Despite the fact that Kearney's responses to a test administered by Dr. Smith indicated that Kearney's description of his disability symptoms was truthful, realistic, internally consistent, and suggested no psychiatric diagnosis, Dr. Smith concluded that Kearney's inability to return to work as an attorney was motivational in origin. Dr. Smith summarized his results as follows:

[M]y evaluation of Mr. Kearney does not reveal any evidence of cognitive, verbal skill, or memory deficits which would preclude him from effectively functioning as an attorney at the present time. . . . I can certainly find no evidence of neuropsychological deficits which would prompt him to be labeled disabled. Those physicians who have drawn such conclusions have done so simply based on the patient's self-report, and not as a result of formal or systematic evaluation.

Based on Dr. Smith's report—specifically, his medical diagnosis and his description of Kearney's hobby of driving race cars—Robert Case, Standard's claim analyst, notified

Kearney by letter that his long term disability benefits would be terminated .because Standard believed he was no longer unable to perform his specialty as a trial attorney.

Kearney soon wrote back to Standard urging it to reverse its decision. In support of his position, he enclosed recent reports from Dr. Irwin Weinreb, a cardiologist, and Dr. Robert Bittle, a diplomat of the American Board of Psychiatry and Neurology, that stated that Kearney probably was .disabled from working as a trial attorney and that, upon further testing, this conclusion could be confirmed.

Dr. Weinreb's complete medical-cardiac evaluation revealed two abnormal EKG's and demonstrated that Kearney was prone to chronic fatigue and reduced stamina. Dr. Weinreb suspected that Kearney suffered from diminished memory owing to his heart condition and stated that, without question, he had naturally progressing coronary occlusive atherosclerotic artery vascular disease from 1988 forward. Dr. Weinreb concluded that while Kearney could do legal work *outside of trial work*, he should be precluded "from very heavy work and very severe emotional distress," and "certainly should avoid intense emotional stress and not be on a very tight time schedule."

Dr. Bittle's report stated that Kearney's cardiac impairment caused chronic and easily induced fatigue, and reduced stamina. Dr. Bittle also reported that although most neurocognitive deficits tend to improve with time following cardiac surgery, he believed that Kearney fell into the minority who retain neurocognitive behavioral problems. Cognitive problems that might appear subtle, Dr. Bittle emphasized, greatly increase in the face of the stress and situations when one must remember a multitude of facts. Thus, Dr. Bittle concluded that although Dr. Smith may have correctly concluded that Kearney could return to some type of legal work, it was "highly medically probable" that his cognitive deficiency interfered significantly with his ability to function in the highly complex arena of trial work. Equally important, Dr. Bittle stated that more sophisticated testing than Dr. Smith's was needed in order to determine the extent of Kearney's potentially

subtle but significant residual cognitive deficits. He explained that further neurophysiological studies could document the problems of which Kearney complained, but that Dr. Smith had not conducted such tests.

Dr. Fraback, a rheumatologist employed by Standard, was the first Standard doctor to review Kearney's supplemental reports, although he never examined Kearney himself. Because Dr. Fraback viewed Kearney's doctors' results as "suspect," he preliminarily concluded on the basis of the medical reports that Kearney would be able to practice as a trial attorney. (Dr. Fraback provided no explanation regarding his knowledge of the duties of a trial attorney.) At the same time, however, he strongly advised Standard to procure Dr. Weinreb's EKG's and other medical data for further study. If the EKG's were accurate, Dr. Fraback explained, then Kearney's heart condition would indeed constitute a significant impairment.

In an addendum to his earlier report, Dr. Smith also reviewed the reports of Dr. Weinreb and Dr. Bittle. Without performing any additional physical examination or analysis, Dr. Smith said that he found no neuropsychological reason Kearney could not return to work as an attorney, "even in a trial setting." At the same time, however, Dr. Smith conceded that "whether there are cardiovascular preclusions to returning to the work of a trial attorney is outside of the realm of my expertise to determine." Finally, he admitted to not performing the tests that Kearney's doctors recommended, but reminded Standard that he had not been asked to perform such tests and claimed that, given Kearney's symptoms, they were unnecessary in any event.

Standard never sought to obtain the medical data that Dr. Fraback recommended it review. Instead, on January 27, 1995, its Quality Assurance Unit reviewed Kearney's claim and decided not to reverse its decision to terminate his long term disability benefits. Standard wrote:

The occupation of a trial attorney is sedentary and falls well within the physical restrictions outlined by Dr. Weinreb. Much of the work involves conducting research

and does not require being in court or on a very tight time schedule.

... We do not dispute that Mr. Kearney cannot continue to work 75 hours per week managing the business end of his law firm, trying his own cases, and running his leasing company, in addition to pursuing his hobby of racing cars.

... [However, t]he issue upon which we must focus is whether or not he has the physical and mental capabilities to perform, with reasonable continuity, the material duties of a trial attorney, as it is performed in the general economy. Based on our review, we do not find satisfactory evidence to support your client's claim that he is so impaired mentally and physically that he is unable to practice as a trial attorney.

On March 7, 1995, having exhausted his administrative remedies, Kearney filed the instant suit, alleging that Standard had terminated his benefits in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B) (1994).

After the parties filed cross motions for summary judgment, the district court granted summary judgment in favor of Standard. First, the court held that Kearney was entitled to a de novo review of the record, but limited its scope of review to the evidence before Standard when it denied benefits for the last time. Hence, the court prevented Kearney from offering expert evidence describing the material duties of a person engaged in his specialty, as well as additional medical evidence elaborating on his physical condition and on the relationship between cardiac impairments and performance of a trial lawyer's duties. In a second order, the court ruled that Kearney's condition failed, as a matter of law, to constitute a disability under the terms of the policy. The court concluded that:

The fact that plaintiff should, like most of us, avoid severe emotional stress or very hard work does not warrant the conclusion that he cannot practice as a trial attorney....

....

[T]here is no question that plaintiff's physical and mental stamina has been weakened by his heart condition. Unfortunately, the LTD policy does not insure that he would forever remain at his former state of health and stamina. Without sufficient evidence that the condition left him so disabled that he cannot perform the functions of a trial attorney, plaintiff's claim fails.

In addition, the court held that the second definition of "disabled" in the long term disability policy—the inability to earn 80% of predisability earning while working in the attorney's specialty—did not apply because Kearney was not working at the time Standard decided to terminate his claim.[2]

Kearney then filed a motion under Rule 59(e) to vacate the judgment or, in the alternative, for entry of a new and different judgment. The district court denied his motion without oral argument and ordered him to pay attorneys' fees to Standard to compensate it for the cost of litigating his motion.

Kearney now appeals both of the district court's decisions, arguing that the district court should have granted summary judgment in his favor (or, at least, should have denied Standard's motion for summary judgment) and that it erred in assessing attorneys' fees against him on his Rule 59(e) motion.

## DISCUSSION

In Parts I and II, we determine the proper standard and scope of judicial review of Standard's decision to deny Kearney disability benefits. Then, in Part III, we review the district court's decision upholding the denial of benefits. Finally, in Part IV, we address the award of attorneys' fees.

### I. Standard of Review

■ Kearney's policy read, in relevant part, that Standard would pay long term disability benefits "upon receipt of satisfactory written proof that you have become DIS-

---

2. Because we conclude, *infra* at Part III, that the district court erred in granting summary judgment based on the policy's first definition of disabled, we need not consider whether its dubious interpretation of the second definition is correct.

ABLED while insured under the GROUP POLICY." Because the district court found that this clause did not "unambiguously vest[ ] the administrator with discretionary power" to determine eligibility for long term disability benefits, it reviewed the case de novo. Standard contends that, particularly due to our intervening holding in *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996), the policy does vest discretionary authority in the administrator; thus, it asserts, the district court and this court must review the administrator's decision for an abuse of discretion. Standard is mistaken. We have never held that so imprecise and ambiguous a provision as contained in Kearney's policy vests discretion in the administrator, and we decline to do so now.

**■** In an action to recover benefits under an ERISA plan, the district court must review the administrator's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). When the administrator retains such discretionary authority, the district court ordinarily will review the administrator's determinations for an abuse of discretion. *See Snow,* 87 F.3d at 330; *Winters v. Costco Wholesale Corp.,* 49 F.3d 550, 552 (9th Cir.), *cert. denied,* 516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995). If the plan's funding source and its administrator are the same entity, however, and if facts suggest that the entity acted out of self-interest, the denial of benefits will be subject to de novo review. *See Lang v. Long–Term Disability Plan,* 125 F.3d 794 (9th Cir.1997); *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1322–23 (9th Cir. 1995). Here, de novo review is warranted for two reasons, either one of which would be sufficient: (1) Standard did not retain discretionary authority and (2) it has not rebutted

the evidence indicating that its decision was affected by a conflict of interest.

First, we have previously explained that a plan gives the fiduciary the authority to determine eligibility only if the plan includes at least "one important discretionary element, *and the power to apply that element is unambiguously retained by its administrator.*" *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993) (emphasis added). If the administrator does not retain the "power to apply" a discretionary element, it must apply the plan in a purely objective manner, and, more important, courts do not defer to its judgment. In *Snow,* this court applied the principle explained in *Bogue,* holding that a plan providing that "there will be no benefit unless Standard is presented with *what it considers to be* satisfactory written proof of the claimed loss" unambiguously vested discretion in the administrator. 87 F.3d at 330 (emphasis added).[3]

In this case, as in *Snow,* the plan contains a requirement of satisfactory written proof. Contrary to Standard's assertion, however, our holding in *Snow* does not render erroneous the district court's determination regarding the applicable standard of review. As the district court correctly recognized, the language of the plan before us vests Standard with authority to administer the plan and to condition Standard's obligation to pay on an insured's compliance with certain specified requirements, including the offering of "satisfactory written proof" of a disability. Yet the plan here, as opposed to the one described in *Snow,* does not state that Standard retains the authority to determine what *it* considers to be "satisfactory written proof." At best, from Standard's viewpoint the plan that covers Kearney is ambiguous as to whether Standard is granted the discretion to apply its subjective judgment or

3. Despite the fact that Standard issued the plans in both *Snow* and the present case, it is apparent that at least some of the language of the two plans differs. The plan in this case applies only to attorneys, while the plaintiff in *Snow* was not an attorney. Furthermore, for what it may be worth, that we have reservations as to the effect we would give any representation by Standard

that the language of the two plans was identical. *Snow* does not quote the plan's language, and we doubt that we are free to look behind the text of the opinion in an effort to ascertain facts that the court failed to set forth or determine. What matters here is that we described the policy in *Snow* as requiring proof that *Standard* considers to be satisfactory.

606

whether the question of what proof is satisfactory must be determined objectively under applicable legal and medical principles. The distinction is hardly trivial. If, as in *Snow*, Standard retains the authority to deny benefits when it believes in good faith that insufficient proof is offered, it also retains the discretion to give substance to its own standard. *See* 87 F.3d at 330; *see also Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379–80 (7th Cir.1994) (plan used phrase "all proof must be satisfactory to us"); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir.1991) (plan used phrase "on the basis of medical evidence satisfactory to the Company"). If the standard of proof is an objective one, however, Standard may deny benefits only to the extent that courts independently would conclude that the evidence fails to constitute satisfactory written proof. Thus, the different standards of review.

■ The plan's uncertainty on this point is fatal to Standard's assertion of discretionary authority and requires us to adopt a purely objective approach to claimants' eligibility for benefits. We explained in *Bogue* that "[l]anguage that establishes only an entity's right to administer or manage a plan does not confer discretion." 976 F.2d at 1325; *see also Bruch*, 489 U.S. at 111, 109 S.Ct. at 954–55. More important, we added:

> We do not want to encourage an employer to insulate himself from effective appellate review through the abuse of vague phrases that fail to make clear to the employees that the employer will have the final determination of benefit decisions. Employees who lose promised benefits should not lose the additional benefit of judicial review because their employer reserved discretionary power to itself without making that reservation clear.

*Bogue*, 976 F.2d at 1325. Thus, drafters of plans, if they wish the courts' review to be limited, must leave no doubt in the language of the plan that an administrator has the authority to construe the terms of the plan and to exercise its discretion when making eligibility decisions. Otherwise, ambiguities will be construed against the drafter and eligibility determinations will be evaluated under an objective standard.

■ The plan in *Snow* allowed Standard to deny benefits when not faced "with what *it considers to be* satisfactory written proof"; the plan in this case, however, speaks only in general terms of the claimant's obligation to submit "satisfactory written proof." The district court was, therefore, right to conclude that the plan fails "unambiguously" to provide Standard with the discretion to make eligibility determinations.[4] And nothing in *Snow* alters the correctness of that decision. Indeed, faced recently with a plan with nearly identical language as the plan in this case,[5] the Sixth Circuit, at least initially, reached the same conclusion we do. It explained:

> Simply because [the administrator] has the ability to require written proof before continuing disability benefits does not mean that [the administrator] has the discretionary authority to decide whether that proof is sufficient within the meaning of the Plan. Second, simply because [the administrator] may require "satisfactory proof" does not give the insurance company discretionary authority.... The quoted plan provision does not specify to whom the proof should be satisfactory. [The plaintiff] probably is correct in arguing that this language creates an objective standard—proof "satisfactory" to a reasonable person. But all we need decide at this point is that the language does not clearly give [the administrator] discretion, which is what the language of an ERISA plan must do under *Bruch* to trigger abuse of discretion review.

---

**4.** This conclusion is bolstered by this court's rule that ambiguities in ERISA insurance contracts are to be construed against the drafter. *McClure v. Life Ins. Co.*, 84 F.3d 1129 (9th Cir.1996), *citing Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539–540 (9th Cir.) (as amended), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990).

**5.** The plan stated that: "Subsequent written proof of the continuance of such disability must be furnished to [the company] at such intervals as [the company] may reasonably require.... [The company] shall have the right to require as part of the proof of claim satisfactory evidence." 96 F.3d at 825.

*Perez v. Aetna Life Ins. Co.,* 96 F.3d 813, 826 (6th Cir.1996);[6]   *see also Williamson v. Unum Life Ins. Co.,* 943 F.Supp. 1226, 1228–29 (C.D.Cal.1996) (post-*Snow* case holding same and distinguishing plans that explicitly vest authority in administrator). We agree with this reasoning. The plan's lack of explicit delegation of discretionary authority to Standard requires that (1) Standard apply an objective standard when determining questions such as what constitutes satisfactory written proof and (2) Standard's determinations be reviewed on a de novo basis.

■■■ Second, de novo review also is required in this case because the record suggests that Standard was influenced by the practical conflict of interest that exists in this case, in which it is both the insurer and the administrator. *See Lang,* 125 F.3d at 798. If evidence indicates that a plan administrator's "self interest caused a breach of the administrator's fiduciary obligations to the beneficiary," we employ a searching inquiry in which "the plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits." *Atwood,* 45 F.3d at 1323. While two of our recent opinions in which no conflict was found might seem at first glance to suggest that we review a conflicted administrator's decision only "more stringently," but not fully de novo, a closer examination of our cases reveals that we do in fact review such decisions de novo if an actual conflict exists. *Compare Estate of Shockley v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403, 405 (9th Cir. 1997) (stating that when evidence exists "*tending to show* that the fiduciary's self-interest" resulted in a conflict of interest "we have imposed *more searching scrutiny*"—but finding no conflict to exist, so not further describing that scrutiny) (internal quotation marks omitted and emphasis added) *and Snow,* 87 F.3d at 331 (stating that in conflict cases "the standard of review would not exactly change, but scrutiny of [the administrator's] decision would become *more searching*"—but finding no conflict to exist, so not further describing that type of scrutiny) (emphasis added) *with Lang,* 125 F.3d at 798 (holding that when there is an *actual conflict* of interest "our review becomes *de novo,* without deference to the administrator's tainted exercise of discretion" and *applying de novo review*) (internal quotation marks omitted) *and Atwood,* 45 F.3d at 1322–23 (holding that when a conflict of interest *actually exists* "we will review the decision *de novo,* without deference to the administrator's tainted exercise of discretion").

■■■ As Judge Sneed's concurrence accurately states, our opinion in *Atwood*—the first we issued on the subject, and upon which both *Estate of Shockley* and *Snow* (as well as *Lang*) draw—harmonizes these cases by explaining that we actually "review apparently conflicted [administrators] in two steps." *Atwood,* 45 F.3d at 1323. We first, following well established principles of trust law and the Supreme Court's opinion in *Bruch,* apply a "'less deferential' standard ... to *apparently conflicted* fiduciaries" to determine whether an actual conflict exists by shifting the burden to the administrator to demonstrate that either (1) no conflict actually exists or (2) that the conflict did not "affect the decision to deny benefits." *Id.* (emphasis added). "If the plan cannot carry that burden," then "we will review the [administrator's] decision *de novo* without deference to the administrator's tainted discretion." *Id.* In other words, as *Atwood* further explains, "[u]nder this standard, if a conflicted fiduciary's interpretation which advances the fiduciary's interest at the expense of the beneficiary's is 'wrong' under *de novo* review but still 'apparently reasonable,' the fiduciary has committed an abuse of discretion unless the plan can show that the interpretation was not made to serve its conflicting interest." *Id.* at 1322 (quoting *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1566–67 (11th Cir.1990)). Both *Estate of Shockley* and *Snow* found occasion only to apply the first step of the *Atwood* analysis, so they never reached the step of applying de novo review to the actual deci-

**6.** The Sixth Circuit has since vacated this decision and reheard the case en banc to reconsider this issue and others. 106 F.3d 146 (6th Cir. 1997). The en banc court has not yet announced its decision. However, our decision is in no way dependent on the en banc court's adopting the panel decision with which we agree.

sion. If, in those cases, the administrator had not carried its burden of dispelling the evidence of a potential conflict, de novo review would have applied, just as in *Lang.*

Here, after Kearney's doctor, Dr. Weinreb, diagnosed Kearney as disabled, Standard's doctor, Dr. Fraback, strongly suggested that Standard obtain Dr. Weinreb's test results, which had indicated that Kearney's ability to practice his specialty was significantly impaired by his heart condition. Yet Standard failed to obtain or to consider the results of Dr. Weinreb's tests and simply proceeded to deny Kearney's claim. Standard's lack of interest in reviewing relevant medical data is sufficient to suggest that it acted out of self-interest. Finally, Standard has failed to show that its failure to obtain the additional information could not have affected its eligibility decision. *See Lang*, 125 F.3d at 798.

## II. The Scope of Review

■ Kearney argues that the district court erred in limiting its scope of review to the evidence that was before Standard when Standard made its decision to terminate his benefits. He contends that, because of the complexity of the issues involved, he should have been able to present additional evidence beyond that in the administrative record regarding the material duties of a trial attorney and whether his heart condition prevents him from performing some of those duties. We agree and hold that the district court abused its discretion in refusing to admit such evidence.

■ The purpose of de novo review in ERISA cases "is to provide greater assurance that employees will get the benefits to which they are entitled under the written terms of the plan documents." *Orozco v. United Air Lines, Inc.*, 887 F.2d 949, 953 (9th Cir.1989). In general, however, courts conducting de novo review of ERISA benefits claims should limit the evidentiary record to that which was before the plan administrator at the time of its decision. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir.1995).

Nonetheless, "new evidence may be considered under certain circumstances to enable the full exercise of informed independent judgment" when applying de novo review. *Id.*

■ In *Mongeluzo*, we joined a number of other circuits in following the Fourth Circuit's approach to this issue, holding that the district court was required to admit evidence beyond what was presented to the administrator "when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Id.* at 944 (quoting *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1025, (4th Cir.1993) (en banc)).[7] In reversing the district court's refusal to admit the additional evidence offered by the plaintiff, we emphasized, however, that district courts should not admit additional evidence "merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Id.* Some of the circumstances that courts should consider in determining whether to allow additional evidence are set forth in *Quesinberry.* They include:

claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review processes with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; ... and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Quesinberry*, 987 F.2d at 1026–1027. This list is, of course, not exhaustive. *Id.* at 1027. Because *Quesinberry* involved (1) complex, medical testimony, (2) the interpretation of a key provision in the plan, and (3) a circumstance in which the payor was also the administrator, the Fourth Circuit held that the

---

7. *See also Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098–99 & n. 4 (7th Cir.1994); *Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176, 1184–85 (3rd Cir.1991); *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir.1989).

district court's decision to allow additional evidence was proper. *Id.* at 1027.

The same three factors present in *Quesinberry* are present in this case, and one raises especially strong concerns—namely, that Standard, acting under a conflict of interest, neglected to obtain additional medical evidence that its own doctor said could establish Kearney's disability. First, the medical issue regarding the extent of Kearney's cognitive deficiency, and its connection to his heart condition, is decidedly complex, as is the question of the extent to which his cardiac condition limits his ability to undergo stress and perform hard work. The doctors' reports on these issues do not always meet head-on, and credibility issues exist. Yet the district court held that it was "well able to review the issues presented without need for additional evidence." We disagree. "[W]here the record contains numerous and possibly conflicting medical terms and diagnoses, excluding new evidence would force this court to become its own medical expert." *Peters v. Life Ins. Co. of N. Am.*, 816 F.Supp. 615, 618–19 (N.D.Cal.1993); *see also Quesinberry*, 987 F.2d at 1027 (stating that "if the court is faced with a complex medical issue on which testimony from experts is necessary for an adequate understanding of the issue and the administrative procedures do not have a mechanism for taking such testimony, allowing such testimony would be appropriate"); *Masella v. Blue Cross & Blue Shield*, 936 F.2d 98, 104–05 (2d Cir.1991) (same). Here, this factor weighed heavily against foreclosing Kearney's ability to submit additional medical evidence—recommended by an array of doctors—that would help develop an adequate understanding both of the extent of his cognitive deficits and the relationship to his heart condition, and the extent of his diminished physical capacity to work long hours and incur serious stress. The district court, instead, unnecessarily risked becoming, in effect, "its own medical expert." *Peters*, 816 F.Supp. at 619.

Second, Kearney's claim turned on the interpretation of a key provision of the plan, the definition of the "material duties" of a trial attorney. The plan administrator's conclusion that trial attorneys' duties were "sedentary," and the lack of information in the administrative record describing the typical duties of trial attorneys, should have alerted the district court to the possibility that the administrator was misinformed or uniformed as to the material duties of a trial attorney. The term "sedentary," as the Social Security Administration defines it, classifies work according to the required physical exertion only and in no way accounts for the required mental stamina, stress-related endurance, or memory skills. *See* 20 C.F.R. § 404.1567(a) (1997). Similarly, the dictionary definition of the term "sedentary" refers solely to the amount of physical exertion involved and does not consider other requirements. *See* 2 The New Shorter Oxford English Dictionary 2755 def'n 2 (4th ed.1993) ("characterized by or requiring much sitting and little physical exercise"). All this, of course, is wholly aside from the odd assumption that trial counsel are primarily chairbound. The mental exertion required and the degree of stress that is inherent in the performance of one's duties obviously makes trial advocacy considerably more demanding for legitimate cardiac patients than ordinary sedentary work. The administrator's questionable conception of the nature of the claimant's work might, in itself, make it "necessary for the case to be reevaluated" under the proper definition. *See Mongeluzo*, 46 F.3d at 944 (holding that, where the original hearing was conducted under a misconception of the meaning of the plan's provisions, case must be remanded to consider additional evidence); *see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir.1996) (same); *Quesinberry*, 987 F.2d at 1027 (same). Additional evidence regarding the nature of trial work would, at a minimum, have aided the district court in conducting its de novo review of whether Dr. Weinreb's warning to avoid stress and hard work rendered Kearney disabled. *See McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1134 (9th Cir.1996) (per curiam) (holding that pertinent inquiry is whether plaintiff is prevented from performing a single material duty). It therefore should have been admitted.

Third, Standard was both the plan's payor and its administrator, which should have

caused the district court to be alert to questions regarding impartiality. *Quesinberry,* 987 F.2d at 1026–1027; *see also Snow,* 87 F.3d at 331 (noting that "if the plan administrator is operating under a conflict of interest, 'that conflict must be weighed as a factor in determining whether there is an abuse of discretion'") (quoting *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57). Standard stood to lose some $1,172,000, excluding cost of living adjustments, if it continued to pay Kearney's claim. Moreover, the record suggests that this conflict may have affected its review of Kearney's claim. *See Atwood,* 45 F.3d at 1322–1323 (if plaintiff produces evidence of conflict, court should review administrator's decisions "very skeptically"). Standard ignored various doctors' recommendations, including a recommendation by its own doctor, that it obtain existing and additional medical data—including Kearney's electrocardiogram and stress EKG performed by Dr. Weinreb (both of which were abnormal)—to help develop the particularities of Kearney's condition. In fact, Standard's doctor, Dr. Fraback, although skeptical of Dr. Weinreb's report, indicated to Standard that Kearney probably would in fact be disabled if Dr. Weinreb's EKG confirmed his diagnosis. It is quite possible that the administrative record was in conflict in large part because Standard failed to obtain this information. Because the "procurement of further evidence" regarding Kearney's heart condition might have altered the administrator's decision, the district court, at the very least, should have allowed additional evidence regarding the efficacy of the additional tests. *See Snow,* 87 F.3d at 333 (emphasizing the importance of obtaining exams by specialists when decision is reviewed de novo). This factor, therefore, also strongly counseled in favor of admitting additional evidence. *See Quesinberry,* 987 F.2d at 1027.

Given the cumulative weight of these compelling reasons to allow evidence from outside the administrative record, we hold that the district court abused its discretion in refusing to permit Kearney to adduce additional evidence before it. The district court should have allowed Kearney to present (1) medical evidence aimed at explaining and resolving the somewhat conflicting medical

diagnoses and (2) evidence describing the material duties of trial attorneys.

## III. The Merits

Although the district court's failure to admit evidence beyond that contained in the administrative record in itself requires us to remand this case for further proceedings, *see Mongeluzo,* 46 F.3d at 938, we are also compelled to reverse the district court's grant of summary judgment in favor of Standard because the record, even as it now stands, contains unresolved issues of material fact. Thus, even if Kearney had not sought to present additional evidence, or if the additional evidence would not have further advanced his claim, the district court's summary judgment decision would be in error.

The district court held, despite the nearly unanimous agreement to the contrary among the physicians who treated or examined Kearney, that he was able to perform all of his duties as a trial attorney. Specifically, the court ruled that "there is no question that plaintiff's physical and mental stamina has been weakened by his heart condition", but that "the fact that plaintiff should, like most of us, avoid severe emotional stress or very hard work does not warrant the conclusion that he cannot practice as a trial attorney."

We must determine whether Standard has demonstrated that no issues of material fact remain as to whether Kearney was unable to perform at least one of the material duties of a trial attorney when Standard terminated his disability benefits. *See Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir. 1996) (movant retains burden of persuasion); *McClure,* 84 F.3d at 1134 (holding that pertinent inquiry is whether plaintiff is prevented from performing a single material duty). We conclude that the record reflects genuine issues of material fact regarding (1) the extent of Kearney's physical and cognitive impairments and (2) the question whether, even if those impairments preclude him only from undergoing severe stress and engaging in very hard work, Kearney was able to perform all of the material duties of a trial attorney.

First, it is somewhat difficult to understand how the district court could conclude that Kearney was not disabled as a matter of law when every one of the treating and examining physicians, save Dr. Smith, either concluded that he was disabled or recommended further testing on the basis that he probably was disabled. *Cf. Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir.1990) (noting that nonexamining physician's opinion should be given less weight than examining physician). Dr. Weinreb, for example, reported as late as October, 1994 (four months after Dr. Smith's exam) that Kearney "could do legal work outside of trial work, wherein he can work within his disability described above, both physically and emotionally." This statement strongly suggested that "trial work" was still out of the question. Dr. Bittle also reported that Kearney's cognitive impairments probably precluded trial work and that further tests could confirm that prognosis. And all the while, Kearney's treating physicians, Dr. Morrison and Dr. Lehman, flatly diagnosed Kearney as disabled. Furthermore, it seems quite debateable that Kearney's ability to play some doubles tennis and his occasional practice of driving a race car—both of which were heavily relied on by Standard and the district court in denying Kearney's claim— are in any way inconsistent with an inability to perform all of the material duties of a trial attorney without seriously jeopardizing one's health.[8] To be sure, Dr. Smith concluded that Kearney's relevant impairments were "motivational in nature" (itself a curious conclusion regarding a person with a classic Type A personality), but the point is that, in the face of contradictory evidence, the district court should have refrained from resolving the issue of Kearney's medical condition at the summary judgment stage. *See, e.g., Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.1996) (courts at summary judgment stage must not weigh the evidence or determine the truth of the matter).

■ Second, an issue of material fact remains regarding the "material" duties of trial attorneys. A material duty is any duty that a person must perform in order to execute the functions of an occupation. *See Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 434, 436–37 (6th Cir.1997). Kearney submitted evidence from a Department of Labor handbook stating that trial attorneys "need an exceptional ability to speak quickly and speak with ease and authority and must be thoroughly familiar with courtroom rules and strategy.... [ ] Lawyers often work long hours, and about half regularly work 50 hours or more per week. They are under particularly heavy pressure, for example, when a case is being tried." Standard, on the other hand, claimed that the "occupation of a trial attorney is classified as sedentary.... Much of the work involves conducting research and does not require being in court or on a very tight time schedule." It is unclear whether the district court agreed with this seemingly odd conclusion of Standard's regarding the life of a trial lawyer or whether it substituted a related definition of its own. Regardless of whether a finding along the lines suggested by Standard could ever stand up to scrutiny, it was erroneous for the court to reject the evidence offered by Kearney with the only conflicting evidence in the record being Standard's. If the court had accepted as true Kearney's evidence that performing the job of a trial attorney involves long hours, hard work and considerable stress,[9] it probably would have had to find that Kearney was legally disabled in light of Dr. Weinreb's explicit admonitions to avoid such working conditions. *See McClure*,

8. Whether it is wise for a person with a heart condition, or indeed anyone, to drive race cars occasionally, or frequently, is a question beyond the scope of this opinion. It is sufficient to note for our purposes that if people who are sick or disabled engage in unhealthy or unwise activities it does not render them physically unimpaired. People who continue to smoke after contracting lung cancer may not for that reason be classified as cancer-free.

9. Kearney also correctly reminded the court that one of his material duties is his ethical obligation to his clients to withdraw from representation when he cannot devote sufficient time, energy or quality service to their cause. *See* Cal. R. Prof. Conduct 3–110, 3–700; Cal. Bus. & Prof.Code § 6190. The court made no findings as to whether Kearney could properly carry on his specialty in light of this obligation.

84 F.3d at 1134 (holding that pertinent inquiry is whether plaintiff is prevented from enduring working condition necessary to perform even a single material duty of job). For present purposes, however, we need only conclude that a genuine issue of material fact remains to be resolved.

### IV. Attorneys Fees and Costs

██ Shortly after the district court ordered summary judgment in favor of Standard, Kearney moved under Rule 59(e) to vacate the judgment, pointing out the district court's errors and arguing that an intervening Ninth Circuit case, *McClure*, demonstrated that the district court's order of summary judgment was wrong. The district court denied the motion, and at Standard's request, ordered Kearney to pay attorneys' fees to compensate it for its legal fees in litigating what the district court called a "groundless" motion. Kearney appeals the fee award.[10] We reverse.

██ "We review the district court's decision to award fees against an ERISA claimant for abuse of discretion." *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 407 (9th Cir.1997). We generally consider the following factors in awarding fees under ERISA:

(1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

Credit Managers Ass'n v. Kennesaw Life & Acc. Ins., 25 F.3d 743, 748–49 (9th Cir.1994); Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980). As the Seventh Circuit has explained, even though these factors do not differentiate between plaintiffs and defendants, they "will seldom dictate an assessment of attorneys' fees against ERISA plaintiffs." *Marquardt v. North Am. Car Corp.*, 652 F.2d 715, 719 (7th Cir.1981). We have long recognized the same. *See, e.g., Carpenters S. Cal. Admin. Corp. v. Russell*, 726 F.2d 1410, 1416 (9th Cir.1984) (noting that "the *Hummell* factors very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs").[11]

The fifth factor alone proves dispositive here. Kearney's motion pointed the district court to errors it had made regarding the merits of his case, which are highlighted by *McClure*'s emphasis that an ERISA-disability plaintiff need demonstrate only that he is unable to perform a *single* material duty of his specialty. The district court, therefore, was incorrect in concluding that his motion was "groundless." Indeed, because Kearney was correct in his assignment of error, he more than adequately raised a "colorable claim of clear error," *Thomassen v. United States*, 835 F.2d 727, 731 (9th Cir.1987), making an award of fees and costs inappropriate in any context, let alone under ERISA. *See id.*

### CONCLUSION

We reverse the district court's grant of summary judgment in favor of Standard and remand the case with instructions to allow Kearney to present additional evidence to support his claim. We also reverse the district court's award of attorneys fees to Standard.

### REVERSED AND REMANDED.

---

**10.** Kearney also seeks attorneys' fees under 29 U.S.C. § 1132(g)(1) (1994), which permits plan participants who prevail in ERISA actions to recover fees. Since we remand this case for further proceedings, neither party has "prevailed" in this matter. We, therefore, dismiss this claim as not yet ripe. *See McClure*, 84 F.3d at 1136.

**11.** We stated in *Estate of Shockley* that in the context of ERISA attorneys fees awards we do not "favor one side or the other in ERISA fee cases"; "the playing field is level." 130 F.3d at

408. Of course the *Hummel* factors apply equally to both sides. We do not read *Estate of Shockley*'s statement, however, to contradict or alter what we have repeatedly said: the *Hummel* factors " ' "very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs." ' " *Credit Manager's Ass'n v. Kennesaw Life & Accident Ins. Co.*, 25 F.3d 743, 748 (9th Cir.1994) (quoting *Tingey v. Pixley–Richards West, Inc.*, 958 F.2d 908, 909 (9th Cir.1992) (quoting in turn *Russell*, 726 F.2d at 1416)).

SNEED, Circuit Judge, with whom Judges FLETCHER and REINHARDT join, concurring:

█ Our decision in *Atwood v. Newmont Gold Co.*, 45 F.3d 1317 (9th Cir.1995), is the basic authority on which this case rests. I do not read our opinion to differ on this point. In contrast we apply the *Atwood*'s "less deferential" standard which requires a two-step review process. The first of these steps requires the determination

> whether the affected beneficiary has provided material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. If not, we apply our traditional abuse of discretion review. On the other hand, if the beneficiary *has* made the required showing, the principles of trust law require us to act very skeptically in deferring to the discretion of an administrator who appears to have committed a breach of fiduciary duty.

*Id.* at 1323. We hold that the beneficiary in this case made the showing required by the first step.

Under these circumstances, the *Atwood* decision requires that "the plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits." *Id.* In this case Standard Insurance Company did not meet this burden. Under these circumstances, we reviewed Standard's decision de novo.

While Standard Insurance Company contends that it met its burden, we find otherwise.